The **DELAWARE AND HUDSON RAIL-
WAY COMPANY** et al.

v.

**UNITED TRANSPORTATION UNION,**
Appellant et al.

No. 71–1183.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1971.

Decided March 31, 1971.

Certiorari Denied June 7, 1971.

See 91 S.Ct. 2209.

Messrs. Sheldon E. Bernstein and Lester P. Schoene, Washington, D. C., with whom Mr. Edward D. Friedman, Washington, D. C., was on the pleadings, for appellant.

Mr. Francis M. Shea, Washington, D. C., with whom Messrs. Richard T. Conway, and Ralph J. Moore, Jr., Washington, D. C., were on the pleadings, for appellees.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

This action was begun in 1970 by the plaintiffs, some 170 carriers comprising most of the nation's railroads ("carriers"), against four railway labor organizations, after their current national wage and rules dispute had led to a bargaining impasse. The dispute was settled in 1971 as to the three non-operating unions.[1] Following exhaustion of all the governmental processes for resolution of major disputes contemplated by the Railway Labor Act (Act), the carriers filed a supplemental complaint against the United Transportation Union (hereafter Union, or UTU).[2] They sought an injunction against the Union's conducting any selective strike against a few, or some, or less than all the carriers. The District Court granted the carriers' mo-

1. They are the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC); the Brotherhood of Maintenance of Way Employees (BMW); and the Hotel and Restaurant Employees' and Bartenders' International Union (HRE). Together these three unions represent approximately 220,000 railroad employees.

2. The United Transportation Union was organized January 1, 1968, as the merger of four operating unions: the Brotherhood of Locomotive Firemen & Enginemen (BLFE), the Brotherhood of Railroad Trainmen (BRT), the Order of Railroad Conductors and Brakemen (ORCB), and the Switchmen's Union of North America. It represents about 180,000 employees.

tion and issued a preliminary injunction enjoining the Union from calling any selective strikes against the Burlington Northern, Inc. or Seaboard Coast Line Railroad, or against fewer than all the plaintiff carriers. We conclude that the legal premise underlying the District Court's action was in error. We reverse the order granting the preliminary injunction. On remand the District Court will maintain continuing jurisdiction of the cause to consider any issues, and requests for relief, that may develop as to the legality of actions of the Union or the carriers in the conduct of strikes and countermeasures.

## I. HISTORY OF THE DISPUTES AND THREATENED STRIKE

On October 20, 1969,[3] the Union served each of the carriers with identical notices pursuant to Section 6 of the Act, 45 U.S.C. § 156, proposing changes in existing national agreements relating to pay. On November 7, the carriers served the Union with a notice containing counter-proposals as to work rules to be bargained about concurrently. On November 20, the Union served notices proposing various wage and fringe benefit adjustments. The Union's notices requested each of the carriers served to advise each carrier that "it is requested that you join with other railroad companies in authorizing a national conference committee to represent you in dealing with the subject."

The parties followed established practice and authorized the dispute to be handled by their national bargaining representatives, which in the case of the carriers meant the National Railway Labor Conference (comprised of three regional Carriers' Conference committees [4]), which represents over 90% of the nation's Class I line-haul rail carriers and terminal railroads.

Multi-carrier bargaining by the national representatives of the carriers be-

gan March 17, 1970, and continued from time to time thereafter until April 15, 1970, when the conferences were terminated. On April 16, 1970, the carriers applied pursuant to § 5 First of the Act, 45 U.S.C. § 155 First, for the mediatory services of the National Mediation Board ("Board") in connection with all three Section 6 notices referred to above. The same day the Union applied for the Board's services in connection with its notice of October 20 and the carriers' counter-notice of November 7, 1969.

The Board docketed the dispute arising out of the two initial notices in its Case A–8830 on May 19, 1970, and on June 24, incorporated in that docket the dispute arising out of the Union notice served November 20. Mediation commenced on June 30, 1970. The mediation was conducted between the national bargaining representative of the parties on a multi-carrier basis. It failed to produce a settlement. On August 3, in accordance with § 5 First of the Act the Board requested the parties to submit the dispute created by the three Section 6 notices to arbitration pursuant to Sections 7 and 8 of the Act. On August 6 the carriers accepted the proffer of arbitration but the Union declined the proffer. Accordingly, on August 10, 1970, the Board notified the parties that its mediatory efforts had failed and it was that day terminating its services.

The UTU and the three non-operating unions announced their intention to strike the carriers on September 10, 1970. The parties were required by § 5 First to maintain the status quo in their dispute for 30 days after the Board terminated its services. Their national bargaining representatives met during this 30-day period in an attempt to compose their differences. No agreement was reached. While under the Act the parties became free as of September 10, 1970 to exercise the kind of self help authorized by the Act, they agreed to ex-

---

3. The statement that action was taken "on" a certain date includes action taken "on or about" that date.

4. The Eastern Carriers' Conference Committee, the Southeastern Carriers' Conference Committee, and the Western Carriers' Conference Committee.

tend the status quo through September 14, and to engage in additional negotiations during that period, at the request of and with the assistance of officials of the Board and the Department of Labor.

These efforts failed. On September 15, 1970, three of the Nation's railroads were struck—the Baltimore and Ohio, the Chesapeake and Ohio and the Southern Pacific. Meanwhile, on September 14 the carriers filed their complaint in the case now before us. At 11:40 p. m. on September 14 District Judge Corcoran issued a temporary restraining order, conditioned on a small cash undertaking, enjoining defendants from calling selective strikes on less than all the plaintiff carriers. The motion for preliminary injunction was initially set for September 23. During the course of September 15, the District Court issued an order to show cause why coercive civil contempt fines should not be imposed upon the unions if the strikes were continued. The strikes were terminated and the order to show cause was duly vacated on motion of the carriers. On September 23, the defendant unions filed a motion for prompt trial, which was denied by Judge Pratt by a fiat order entered that day.

Meanwhile the President appointed Emergency Board No. 178, created by Executive Orders 11558 and 11559, issued September 18. Section 10 of the Act requires parties to a major dispute to maintain the status quo until an emergency board reports its recommendations to the President (within 30 days after its creation) and for 30 days after such report is made. The Board convened on September 24, and held public hearings September 30 through October 17, 1970. During the course of the hearings, the parties agreed to request the President to extend, until November 10, 1970, the period in which the Board was to submit its Report. Such extensions for Board consideration have been agreed upon for past disputes. The President granted this request.

Board No. 178 rendered its Report on November 9, 1970.[5] The carriers accepted its recommendations for national agreements settling the disputes. The unions rejected those recommendations. Further national bargaining failed to settle the dispute within the 30-day period following the issuance of the report.

At 2:10 a. m. on December 10, 1970, the President signed P.L. 91–541. This put into effect the wage increases recommended by Board 178 for adoption in 1970 (see note 5), and extended the status quo requirement of Section 10 of the Act so as to provide that no other changes could be made by the parties, except by agreement, prior to 12:01 a. m., March 1, 1971.

It appears that the unions commenced striking the carriers nationally as of 12:01 a. m. on December 10. At 3:17 a. m. the District Court entered an order temporarily restraining such strikes. No contention is made that UTU violated this order.

Following the enactment of P.L. 91–541 further national bargaining ensued and the disputes with the three non-operating unions were settled by national agreements prior to March 1, 1971, in accordance with the recommendations of Emergency Board No. 178.

The carriers and UTU did not reach an agreement. On March 7, the carriers filed motions for a temporary restraining order and preliminary injunction, stating that they had been made aware that the UTU intended to strike the Burlington Northern and Seaboard Coast Line as of 12:01 a. m. on March 8, and requesting an order prohibiting such selec-

---

5. The Report of Emergency Board 178 appears in Railway Labor-Management Dispute, December 1970, Hearing before the Senate Committee on Labor and Public Welfare on S.J.Res. 246, Dec. 9, 1970 (91 Cong., 2d Sess.) p. 133. The Board recommended certain wage increases, including a 5% increase retroactive to January 1, 1970, and a 32¢ per hour increase effective November 1, 1970. As to work rules the Board made a number of recommendations which reflected a conclusion of merit in the carriers' position.

tive strikes. When counsel appeared before District Judge Corcoran, Judge Pratt not being available, on the afternoon of Sunday, March 7, Union counsel conceded that strikes were scheduled to commence at midnight against these two carriers. It subsequently developed that the UTU had sent the President a letter dated March 6, with copies to three Cabinet members and two members of Congress, advising that it was "calling a peaceful withdrawal from service of all its members" on those two roads on March 8. In any event, in the course of the conference on March 7, the Union counsel, after telephoning the president of UTU, assured Judge Corcoran that no carrier would be struck prior to 2:00 p. m. on March 11, 1971. Accordingly the Judge did not issue a temporary restraining order. On March 10, 1971, after an evidentiary hearing held that day, District Judge Pratt issued a preliminary injunction against selective strikes by the UTU. That Union moved in this court for summary reversal of that order.

## II. DISCUSSION OF SUBSTANTIVE LEGAL ISSUES

Disposition of this appeal requires discussion of substantive legal issues and principles, and we focus on these before turning to such equitable considerations as the propriety of relief in the light of threatened injury and the public interest, and to procedure appropriate for this litigation.

■ 1. The purpose and scheme of the Railway Labor Act is to "provide a machinery to prevent strikes" and the resulting interruptions of interstate commerce.[6] As to minor disputes the Act provides for compulsory arbitration. As to major disputes, like the pay and work rules disputes before the court, the Act's machinery operates not to prohibit strikes but to delay them in order to assure ample opportunity for negotiation and mediation. When the Act was drafted both railroads and unions were bitterly opposed to compulsory arbitration and the settlement of major disputes was left to a process of non-compulsory adjustment.[7] What was provided was an elaborate process, specified in detail, consisting of a number of stages which the parties must explore before the right of self help may be asserted.[8]

■ The parties are obligated to refrain from self help while the Act's procedures are being pursued. This obligation of restraint endures although these procedures "are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves

6. Texas & N.O.R.R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930).

7. Detroit & Toledo Shore Line R. R. v. United Transportation Union, 396 U.S. 142, 148, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

8. These were concisely stated in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969):

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*. §§ 2 Seventh, 5 First, 6, 10.

the dispute." [9] "The Act's status quo requirement is central to its design." "A final and crucial aspect of the Act [is] the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process." [10] The role of the Government officials is considered so sensitive and critical that ordinary doctrines permitting judicial action on a complaint of arbitrary delay and protraction are so drastically restricted that court relief from continuation of the process will be available, if at all, only in a most extraordinary situation bordering on patent official bad faith.[11]

While the procedures of the Act are "almost interminable," the process is not completely "interminable." It does some time come to an end. Such a time has been reached in the situation before us.

The UTU and carriers have not only pursued the procedures required by law but have also agreed to provide extra time at significant junctures for these processes beyond that required by law, for the periods September 10–14, 1970, and October 18–November 10, 1970. Both Union and carriers now have authority in law, under present law, to resort to the ultimate right of self help.[12]

2. The right of self help embraces, as to the unions, the right to strike. This is conceded by the carriers, but they say that the right to strike must be exercised solely by a strike called against all the carriers of the nation when national handling and bargaining are obligatory under the Act.

The carriers' legal position is bottomed on the principles set forth in the so-called *Alton* opinion of Judge Corcoran, Int'l Ass'n of Machinists & Aerospace Workers v. National Railway Labor Conference, 310 F.Supp. 905 (D.D.C.1970), appeal pending No. 24,217 (D.C.Cir.).

In *Alton* Judge Corcoran was concerned with a labor dispute between the Class I railroad carriers and the four shopcraft unions. The carriers reached an understanding with three of the unions, but an agreement was precluded when one of the unions, the Sheet Metal Workers, balked at a particular work rule acceptable to the others. The shopcraft unions then struck the Union Pacific Railroad at 12:01 a. m. on January 31, 1970. The carriers then announced a nationwide cessation of operations to begin at 10:00 p. m. on January 31, 1970. The unions sought to restrain the lockout, the carriers sought to enjoin the strike. Temporary restraining orders were granted in both actions.

In the *Alton* opinion, Judge Corcoran granted a preliminary injunction to the carriers against the strike. We review his reasoning:

(a) National handling of carrier-union disputes, while not expressly compelled in the Act, is legal and indeed may be obligatory in some circumstances, depending on the issues involved and the "practical appropriateness of mass bargaining" for those issues and the "historical experience in handling any similar national movements." Brotherhood of Railroad Trainmen v. Atlantic Coast

---

9. Brotherhood of Railway & S. S. Clerks v. Florida E.C.Ry., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).

10. Detroit & Toledo Shore Line R. R. v. UTU, *supra*, 396 U.S. at 150, and 149, 90 S.Ct. 294, at 299.

11. Int'l Assn. of Machinists and Aerospace Workers v. National Mediation Board [National Airlines], 138 U.S.App.D.C. 96, 425 F.2d 527 (1970).

12. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., *supra*, 394 U.S. at 378, 89 S.Ct. at 1115:

Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help —"the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." Florida E. C. R. Co. v. [Brotherhood of] Railroad Trainmen, [5 Cir.] 336 F.2d 172, 181 (1964).

Line R. Co., 127 U.S.App.D.C. 298, 302, 383 F.2d 225, 229 (1967).

We note that Judge Corcoran correctly understood the import and implication of our *Atlantic Coast Line* ruling.

(b) National handling was appropriate and obligatory as to the disputes involved in the *Alton* case.

We assume for present purposes that this conclusion of Judge Corcoran was likewise sound.

(c) In the relevant portion of the opinion Judge Corcoran stated, relying on Section 2 First and Section 2 Second of the Act (see 310 F.Supp. at 912):

> "The duty laid out in Section 2 First is 'the heart of the Railway Labor Act.' Railroad Trainmen v. Jacksonville Terminal Co., *supra*, 394 U.S. at 377–378, 89 S.Ct. at 1115. By initiating and negotiating the dispute on an obligatory national basis and then striking the carriers on an individual basis it seems clear that the unions have violated their duty to 'exert every reasonable effort to make * * * agreements * * * and settle disputes.' Having begun on a national level, it is incumbent upon the parties to continue to deal on a national level even after the procedures of the Railway Labor Act have been exhausted. To act otherwise would take on the character of bad faith bargaining."

While there is general language that may be abstracted as indicating that any strike against a single employer of a national bargaining group is illegal, that language must be discounted since the decision was not concerned with the problem now before us. Detroit & Toledo Shore Line R. Co. v. UTU, 396 U.S. 142, 156, 90 S.Ct. 294 (1969). On the contrary, perceptive and careful study of the matter reveals that the core of Judge Corcoran's opinion rests on his determination that the Railway Labor Act is properly construed in present context with the same approach as that used for the National Labor Relations Act, and that the latter has been construed as holding that the duty to bargain collectively on a multi-employer level is violated when a union "attempts to force individual agreements" by striking individual members.

The salient legal principle is made clear by Judge Corcoran's reference to and reliance on Int'l Union of Operating Engineers, Local 825, 145 NLRB 952 (1964). In that case the Board's key findings state that the Union violated § 8(b) (1) and (3) of the National Labor Relations Act "by threatening to strike individual members of the Association in order to force them to withdraw bargaining authority from the Association 'and to enter into individual contracts with the [Union at a time when] it was obligated to bargain for an associationwide agreement with the [Association].' * * * There can be no doubt that the Union might lawfully have struck the members of the Association in order to achieve its legal objectives, or for breaking a legal stalemate or impasse in its negotiations with the Association, but it is equally clear and well settled that it could not lawfully strike or otherwise coerce the Association employer-members with an object of causing them to break off from the Association and execute individual contracts with the Union."

3. This case presents a problem concerning selective strikes not decided in *Alton*.

The Union presents a position and comes forward in support of its claim [13] with direct testimony of its president, Charles Luna (set forth in Appendix A), that it agrees and indeed insists that the underlying dispute is such that national handling is appropriate and obligatory.[14] What the Union asserts is that

---

13. We may assume for present purposes that the Union, as the party with the evidence available, has the initial burden of coming forward with evidence that the purpose of a selective strike following

multi-employer bargaining was other than that of reaching individual agreements with some of the struck employers.

14. Mr. Luna was emphatic that the wage claim be handled nationally. From the

the selective strike is lawful because, as appears from the express testimony of Mr. Luna, the strike called by the UTU against the Seaboard and Burlington was not in derogation of national handling but was for the purpose of putting economic pressure on the carriers to enter into a national agreement, a contract better for the workers than the one the carriers were ready to accept in the bargaining carried on in the absence of such economic pressure.

The District Court's ruling as to the carriers' likelihood of success on the merits, appearing in oral comments shortly after hearing argument on the motion (see Appendix B), embraced the legal premise that even accepting the Union's purpose as set forth in Mr. Luna's testimony, the strike was unlawful.[15]

■ In our view the litigation before us is properly governed by the legal conclusion that when collective bargaining on a national handling basis has come to an impasse and all procedures of the Railway Labor Act have been exhausted, it is not unlawful for the Union to call a strike against some or a few of the carriers in order to put pressure on the railroads to reach a national multi-employer agreement.

This was the legal conclusion set forth in the opinion of the District Court, issued by Judge Parker on March 8, 1971, in reaching a disposition on the merits of another case, between the same parties, involving fireman manning. United Transportation Union v. Burlington Northern, Inc., et al., Civil Action No. 2183–70, opinion attached as Appendix C. This opinion announced the granting of UTU's request for a summary judgment declaring its right to strike selectively for the purpose of exerting eco-

nomic pressure to reach a national agreement, and the denial of the carriers' request for an injunction against selective strikes. The core of the decision is reflected in the declaratory judgment subsequently issued by the court:

2. That under the Railway Labor Act once the statutory procedures have been exhausted in good faith without agreement being reached upon a union bargaining notice whose national handling is obligatory and negotiations are thus legally at an impasse, a selective strike action then becomes a legitimate economic tool which the union can exert against the carriers involved in the national handling negotiations so long as the union continues to seek a national agreement by applying economic pressure on the carriers without seeking to coerce individual carriers into disrupting the multi-employer bargaining unit and settling on an individual basis.

We do not prejudge a case that is not before us, and we are not to be taken as holding that Judge Parker acted correctly in either the granting or denial of relief in the matter before him. We cannot avoid, however, appraisal of the substantive rule of law applicable to the case before us, and we find our views as to the state of the law congruent with those voiced in Judge Parker's opinion.

We intend no ruling on the Union's contention that principles of collateral estoppel precluded Judge Pratt from applying to the same parties a legal principle different from that applied by Judge Parker. We deem the public interest to warrant this court's addressing itself to the proper substantive rule on the merits.

Judge Parker's ruling is also in accord with the rulings under the National

---

decision of Board 178 it appears the Union would have disclaimed national handling for the work rule issues presented by the carriers' notices taken by themselves. But these work rules were a sufficiently germane counterproposal to require handling at the same time and manner as the wage issue. We under-

stand Union counsel to concede that under the circumstances the Union was obligated to bargain on a national basis as to the work rule changes proposed in the carriers' counterproposal.

15. The ruling does not contain these express words, but that is its fair import.

Labor Relations Act which, as Judge Corcoran noted in *Alton,* are material though not decisive in defining duties under the Railway Labor Act. In Arizona District Council of Carpenters, 126 NLRB 1110, 45 LRRM 1448 (1960), it was held that the National Labor Relations Act does not prohibit a strike against some members of a multi-employer bargaining unit, begun after bargaining resulted in impasse, when the strike was not for the purpose of concluding individual agreements with the struck contractors but to put pressure toward an Association agreement. The Board rejected the contention of the General Counsel that the economic pressure on the members struck would have a natural tendency to cause them to withdraw from the multi-employer unit, and that therefore a partial strike against a multi-employer unit is a per se violation of the Act. The General Counsel's subsequent rulings accept this approach.[16]

We are not controlled by these citations as binding precedent. Their reasoning, however, is persuasive. The Railway Labor Act defers and delays, but in the last analysis it does not deny, a Union's right to call a strike. That right of self help has been reached in the case before us. The courts are not free to terminate or qualify that right, except in pursuance of authority granted by Congress. No such authority appears in the wording of the Railway Labor Act. Any doctrine that the right to strike may be limited by implication must be carefully confined. The Norris-LaGuardia Act has withdrawn the power of the Federal courts to issue injunctions in labor disputes. That prohibition is subject to

an overriding doctrine permitting the issuance of an injunctive order in order to enforce compliance with the requirements of the Railway Labor Act.[17] The obligation to bargain collectively may fairly comprehend a duty to bargain on a national handling basis, and to seek to reach national agreement. But the Union has bargained on a national basis, and it seeks to reach a national agreement. It now has the right to strike and to use economic pressure so long as it does not violate its obligation to continue to bargain collectively. As *Alton* points out, the duty is to bargain in good faith, which means an absence of bad faith, and an effort to pursue single agreements may be taken as undercutting an obligation to conduct national bargaining in good faith. But an effort to pursue a national agreement by increasing the use of non-violent economic pressure is subject to no such condemnation.

4. Judge Pratt held that the Act precluded the Union from calling a strike on the two carriers because, by its own account, it was not seeking to reach an agreement with those carriers and indeed stated it would decline to consider an agreement by those companies to end the strike on terms acceptable to the Union. In point 5 we consider this theory. For a clear picture of the shape of the controversy before us we interject to take account of the quite different, almost diametric, position that the carriers put forward in their motion papers in District Court, and reiterate on appeal as an alternative argument available for affirmance of the injunction.

The carriers begin with the premise that as to this dispute they have a con-

---

16. General Counsel Ruling No. SR–1994, 50 LRRM 1181 (1962). General Counsel refused to issue complaint on charge of employer association that union, during bargaining impasse, engaged in strike against employers who were members of bargaining committee "since evidence does not contradict union's assertion that selection of struck employers stemmed solely from union's desire to exert greatest economic pressure without putting all its members on strike."

17. Brotherhood of R. Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 39–42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Brotherhood of Loc. Fire Eng. v. Bangor & Aroostook R. Co., 127 U.S.App.D.C. 23, 36, 380 F.2d 570, 583 (1967).

tinuing right to bargain and agree as a group through joint national representatives, and that the Union has a reciprocal obligation to respect that right. We do not understand the Union to contest this position and in any event we accept it.

The carrier's conclusion that the Union's strike against two roads is a violation of the carriers' group right to bargain as a group may be presented in capsule form by quoting this sentence from their moving papers: [18]

> "The foreseeable effect of such strikes —unless enjoined by the Court or countered by a lockout—is to coerce the struck carriers into withdrawing from multi-carrier national handling of the dispute and to seek to make the best individual agreements that they can with the UTU through their respective officials."

The carriers sought to obviate any Union profession that its purpose was to continue national bargaining with the assertion that the foreseeable consequence of the selective strike is to coerce the struck carriers to withdraw from national handling and that the Union must be held to intend the foreseeable consequences of its conduct.[19]

We think it useful to present at length the contention as renewed in the response filed by the carriers on appeal: [20]

> "[E]ven under Judge Parker's view of the law a selective strike violates the Railway Labor Act if it would 'coerce individual carriers into deserting the multi-employer bargaining unit and settling on an individual basis.' And, there is extensive evidence in the record that whipsaw strikes in the circumstances of this cause would force the struck carriers to seek to withdraw from national handling of the dispute and to make the best individual agreement that they can, however unreasonable or extravagant. We refer the Court particularly to paragraphs 31–33 of the Affidavit of John P. Hiltz, Jr., paragraphs 8–21 of the Third Supplemental Affidavit of John P. Hiltz, Jr., and the Affidavits of W. Graham Claytor, Jr., W. Thomas Rice and Thomas C. DeButts.

> "As that evidence demonstrates, the railroads are particularly vulnerable to strikes in view of their precarious

18. Plaintiffs' Memorandum of Points and Authorities in Support of Motion for a Preliminary Injunction Against the Defendant United Transportation Union, p. 7.

19. Plaintiffs' Memorandum cited note 18, at p. 17:
"[T]he carriers' affidavits demonstrate that a foreseeable consequence of such whipsaw strikes is to coerce the struck carriers to withdraw from national handling and settle the dispute as best they can on an individual basis. As the Supreme Court has recognized, an unimpeded 'whipsaw strike * * * enjoys an almost inescapable prospect of success' and the 'prospect that the whipsaw strike would succeed in breaking up the employer association' is 'not at all fanciful. * * *' Labor Board v. Brown, 380 U.S. 278, 284–285 [85 S.Ct. 980, 13 L. Ed.2d 839] (1965). See, also, Labor Board v. Truck Drivers Union, 353 U.S. 87 [77 S.Ct. 643, 1 L.Ed.2d 676] (1957). * * * The general rule 'that a man is held to intend the foreseeable consequences of his conduct' is, of course, applicable in labor cases. Radio Officers v. Labor Board, 347 U.S. 17, 45 [74 S.Ct. 323, 98 L.Ed. 455] (1954). See, e. g., Labor Board v. Erie Resistor Corp., 373 U.S. 221, 227–228 [83 S.Ct. 1139, 10 L. Ed.2d 308] (1963); Teamsters Local v. Labor Board, 365 U.S. 667, 675 [81 S.Ct. 835, 6 L.Ed.2d 11] (1961). Thus, regardless of any professions that the UTU may make concerning its intent or purpose to continue bargaining nationally for a national agreement, its conduct in whipsawing the carriers under the circumstances of this case will have the foreseeable effect—and therefore an intent or purpose—of coercing individual agreements so as to violate the Railway Labor Act as interpreted by Judge Parker in the Burlington Northern case."
In this and other excerpts we have omitted citations and cross-references which we consider distracting and of no present consequence.

20. Appellees' Response to Appellant's Motion for Immediate Summary Reversal of Order Below Granting Preliminary Injunction, pp. 6–8.

financial condition; the fact that they are a service industry which cannot stockpile in preparation for a strike or later make up for losses in production, so that traffic diverted to another railroad or to another mode of transportation is lost forever; the fact that customers who are forced by a strike to arrange other methods of transportation often do not resume using the struck railroad (or do so to a much lesser extent) once the strike is ended; the fact that the rates charged by railroads cannot be increased without approval of the ICC (which often involves extensive delays); and various other considerations. The railroad unions, on the other hand, are in an unusually strong position. Not only do the employees represented by non-striking unions almost invariably refuse to cross the picket lines established by the striking unions so as to make continued operation in the face of a strike largely impossible, but railroad employees—unlike those in any other industry—are paid unemployment benefits while engaged in a lawful strike (as are the employees who refuse to cross picket lines). Those benefits are paid from a fund made up entirely from contributions by the railroads alone, they are tax free, and they are substantial (usually $12.70 per day). Thus, in effect the railroads are compelled to subsidize strikes against themselves. Moreover, the unions can and do pay additional strike benefits to striking members from funds contributed by the union's members on all carriers, so that there is almost no economic pressure upon the striking

employees to return to work for anything other than a capitulation to their utmost demands.

"In short, where one railroad is forced to stand out alone against the full force of a national union while its traffic is being diverted to competing railroads, among others, it cannot stand out for more than a few days at most. It cannot itself bring about a national agreement, since the multi-employer bargaining agent (here the National Railway Labor Conference) must reflect the views of the majority of its members involved in the dispute (some 170 in all in this dispute) and the majority cannot be expected to accept an agreement they deem to be entirely unreasonable in order to relieve the pressure upon the struck railroad. Thus, the foreseeable effect of a whipsaw or selective strike is to coerce the struck carrier to seek to withdraw from national handling and to enter into an individual agreement on whatever terms it can obtain. And * * * the general rule 'that a man is held to intend the foreseeable consequences of his own conduct' is applicable to labor disputes."

This contention is bottomed on the statements in the carriers' affidavits that in view of the inability of a single carrier or a few carriers to stand out alone against the power of a national union, the foreseeable and "indeed the almost inevitable consequence" of permitting a selective strike was that the struck carriers would beg for a separate peace, resulting in the destruction of their multi-employer bargaining unit.[21]

21. Hiltz third supplemental affidavit paragraph 3; Claytor affidavit paragraph 2. The salient paragraph 16 of Mr. Hiltz' affidavit sets forth:

"16. For many such reasons, individual railroads are extremely vulnerable to strikes, while the employees are cushioned from the financial hardship that is generally the price of striking. The consequence of the situations is that most railroads simply cannot hold out for any time at all against an individual strike. The National Railway

Labor Conference ("NRLC") cannot relieve the pressure on a whipsawed carrier by entering into an agreement on terms deemed by the majority of the industry to be unreasonable, however, because the NRLC is bound to act in accordance with the desires of the majority of the members of the multi-employer bargaining unit. As a result, the foreseeable, predictable, and probably inevitable, consequence of a whipsaw strike is that unless the railroads maintain a united front by locking out all

As we understand Judge Pratt's opinion, he proceeded on a different theory on the merits. But we do not stand on technicality and instead consider whether the carriers have a case so strong that we can and should accept the contention as renewed on appeal. Our consideration leads up, instead, to the conclusion that there are grave difficulties with the carriers' contention.

First, we note that the ultimate issue is not what the carriers thought would happen but the Union's good faith.

Second is the consideration that the carriers' "almost inevitable consequence" doctrine, if accepted, destroys the possibility of any meaning for Judge Parker's ruling that the law permits a good faith selective strike to exert pressure in order to reach a national agreement, provided there is no coercion of individual carriers into deserting the multi-employer bargaining unit and settling on an individual basis. Yet in the *Burlington* opinion Judge Parker not only found that there was no evidence to negative the conclusion that the UTU had bargained in good faith on a national basis, but also took note that during the past twenty years there were a number of instances when the railroad union had exercised the right to individual or selective strikes even though the underlying dispute was the subject of national handling, including the 1950 strike against eight carriers which led to the National Diesel Agreement of May 17, 1950.

Third, we observe that the carriers' affidavits stress what they find is support in history for their conclusions, a support bottomed on the selective strikes by the Brotherhood of Railroad Trainmen, beginning in 1968, over the "crew consist" issue. These resulted in a succession of capitulations and individual agreements by individual railroads after strikes of but a few days, resulting in a reversal of the reductions in crew size authorized by the Award of Arbitration Board No. 282. But in that case the Union was avowedly seeking individual agreements, in the wake of this court's 1967 decision in the *Atlantic Coast Line* case, cited above, which held that "crew consist" was not an issue on which there was an obligation of national handling. And so when Mr. Claytor was called to testify on the subject of his affidavit, he conceded that since the crew consist issue was not being handled nationally "the parallel is not pertinent." (Tr. 30).

■ Fourth, the fact that the present dispute involves a matter subject to national handling means that the carriers may make a national response to defend against a selective strike that jeopardizes national bargaining. At the very least they could introduce unilaterally on a national basis the work rules they proposed in their Section 6 counteroffer. And they could impose a national lockout if necessary to defend the principle of national bargaining.[22]

their employees and thus shutting down throughout the country, the whipsawed carrier will be compelled to sue for a separate peace—to beg for a separate agreement with the striking union."

22. In Brotherhood of Railway & S. S. Clerks v. Florida East Coast Ry., 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), the Court held that after a strike occurs the combination of the carrier's right of self help and duty to operate permits unilateral changes by the carrier even without following the Act's lengthy course for negotiation and mediation.

In the present controversy the carriers had a right under the Act to institute unilaterally the work rule changes they proposed in Section 6 notices, and, in the event of a refusal by the workers to work under those rules, the right to a lockout.

The Court upheld the right of the members of an employers' association as a defense to a strike against one of their members, which imperiled the employers' common interest in bargaining on a group basis, to take action to preserve the multi-employer bargaining basis from the disintegration threatened by the Union's action by closing their plants and locking out their employees until the strike was terminated. NLRB v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed. 2d 676 (1957).

This basic point—that the carriers can take such national action as is needed to defend against the breakdown of national bargaining—is completely omitted from the carrier affidavits, except perhaps for the oblique reference in the affidavit (see note 21) that a selective strike means a breakdown of national bargaining unless there is a national lockout.

Fifth, while counsel for the carriers purports to deride the notion that Mr. Luna could conceive that a selective strike could put economic pressure on a national group, in the absence of some finding based on demeanor we see nothing so inherently improbable in Mr. Luna's testimony as to compel a conclusion of bad faith. He felt the strikes would put pressure on the struck roads to tell their representatives on the national group to settle the issue (Tr. 74). We note that Mr. T. C. DeButts, vice president labor relations, Burlington Northern Inc., is a member of the Western Carriers' Conference Committee, and Mr. C. E. Mervine, vice president of Seaboard Coast Line, is a member of the Southeastern Carriers' Conference Committee. The struck roads would presumably not be devoid of influence in the National Conference. And he felt that without some economic pressure the carriers would be rigid in avoiding further bargaining.

There would also be pressure on the non-struck roads impelling toward a national agreement, including the need to make contributions to the mutual plan to compensate the struck roads—a point that surfaced at oral argument before this Court.

Sixth, we cannot say that a selective strike is inherently incompatible with the objective of reaching a national agreement. Nor can we reject as irrelevant to good faith the position implicit in Mr. Luna's testimony that a national strike would be unavailing to the Union as a means of obtaining national agreement since in all likelihood the carriers would instead seek, and obtain from the legislature, a form of compulsory arbitration. On the other hand, future arbitrary po-

In NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), the Court held that the employers' right of lockout following a "whipsaw" strike against one member of a multi-employer bargaining group included the right, when the struck employer continued business with temporary replacements, to combine the lockout of regular employees with the hiring of temporary replacements to continue operations. The Court held "this was a measure reasonably adapted to the achievement of a legitimate end—preserving the integrity of the multiemployer bargaining unit," with comparatively slight harm to employee rights, and was lawful in the absence of a finding of improper subjective intent to avoid (multiemployer) bargaining with the union. It reversed the Board's approach as resting on an erroneous legal foundation.

Although the *Florida East Coast Railway* case, *supra*, points out that common carriers have a particular and statutory duty to maintain public service, the Court explicitly noted it was not saying that the duty to operate is absolute, and emphasized that the carrier owes the public "reasonable efforts" to maintain public service even when beset by labor-management controversies.

In *Alton* Judge Corcoran held that the carriers' threat of a lockout to be effective some hours after the strike did not negative the "clean hands" required for them to sue to enjoin the strike.

P.L. 91-541 was a joint resolution to provide for a temporary prohibition of strikes or lockouts and the legislative history sets forth that its passage "is necessary to bar railroad strikes or lockouts" until March 1, 1971. H.R.Rep. No. 91-1686, 91st Cong., 2d Sess. 1 (1970).

Even assuming a carriers' lockout might be illegal, the doctrine of Brotherhood of R. Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944), would preclude the UTU from seeking an injunction since the Union's refusal to accept arbitration precluded satisfaction of the "clean hands" requirement of Section 8 of the Act.

It may be that the import of the *Florida East Coast Ry.* decision is that, at least in case of doubt, carriers should apply to the court for authorization to institute lockouts. This could be sought during the interval assured by our ruling requiring reasonable notice by a Union in advance of a strike.

sitions and tactics of the UTU might not only jettison all hope of agreement and precipitate a national lockout by the carriers (see note 32) and the compulsory arbitration dreaded by the Union, but might undercut the assumption of Union good faith underlying our opinion.

We are not to be misunderstood as making a forecast concerning any or all of these broad considerations. What we do say is that we see no basis in the evidence for holding that the Union's profession of purpose in seeking a national agreement is devoid of good faith, either because of subjective intent or because the claimed objective of a national agreement is too flimsy or preposterous to be taken seriously, because it contradicts the "predictable, and probably inevitable" consequence of the Union's action (see note 21).

5. In pointing out the difficulties involved in making a finding of Union bad faith, we have also provided perspective for Judge Pratt's ruling. He sought to obviate those difficulties by accepting Mr. Luna's testimony that he was not seeking individual agreements with the two struck roads. It was elicited that if the Union struck Seaboard Coast Line there would be no way to settle that strike except on a national basis. Because of their significance the pertinent responses given by Mr. Luna to the court and to carriers' counsel are set forth in Appendix A. These include:

The Court: But if it took a year, why conceivably Coast Line will still be struck?

The Witness: That is exactly it, Your Honor.

\* \* \* \* \* \*

The Court: They couldn't make an individual agreement?

The Witness: No, sir; they couldn't do that.

The Court: And even though they tried hard to get Mr. Hiltz to—

The Witness: That is their problem.

\* \* \* \* \* \*

The Court: In other words, Mr. Rice and his road are going to be held hostage until a national agreement takes place?

The Witness: Your Honor, may I explain something?

The Court: Let's answer that question.

The Witness: Yes, sir.

The Court: All right, now go ahead Mr. Luna.[23]

In rebuttal argument carriers' counsel, in addition to the approach of the moving papers that the selective strike would be in derogation of national handling, picked up the "hostage" conception and put it (Tr. 116) that the Act "can't possibly, in my view, be interpreted as permitting a road to be struck and, as you put it, held as hostage for a year or two years while the others hold out. It just seems to be an outrageous suggestion of interpretation of the Act. The right to use economic force is a right to seek a settlement. They can't hit one railroad and destroy it in the way that Mr. Luna is suggesting."

This became the Court's ruling (Tr. 120–121, Appendix B):

"According to the very frank testimony of Mr. Luna, both the Seaboard and the Burlington would be struck until a national agreement is reached. No private agreements with these two carriers would be entered into.

"The purpose of the strike would be to force the Seaboard and the Burlington to put pressure on their bargaining agent in order to reach a national agreement.

"This could take a week, a month, or a year. During this particular period of time, however long or however short, these two roads would be struck, their operations would be closed down and there would be no way by entering

---

23. Mr. Luna here developed his understanding that the roads were divided on their views as to work rules.

a private agreement an individual agreement with the union that these two carriers could get back into operation.

"We are satisfied that a whipsaw strike for such a purpose violates the Railway Labor Act."

The sound legal approach to the so-called "hostage" issue is one which requires reflection, and, we think, consideration in the light of concrete facts rather than abstraction. We reiterate our observations that the courts are not expert in this field of labor relations, they have no guidance from a railway labor tribunal, and they are well advised to proceed with caution before declaring principles that are not expressed in the Act nor so clear and well defined that they must be declared plainly implicit in the Act. The National Labor Relations Board finds nothing illegitimate or inconsistent with free collective bargaining in a union's putting pressure on a multi-employer bargaining unit by striking individual employers. A strike begun with a lawful purpose may become illegal because of methods used in carrying on the strike, and it may be that this might apply to refusal to bargain with an employer who has withdrawn from the multiple unit. But such determinations cannot fairly be made in advance of ascertaining the factual perspective.

The case before us is one in which the declaration of absolute principle brought forth by the court was particularly inappropriate because the Union's intentions had not been formulated on the issue of negotiating with a carrier which withdrew from collective bargaining, and the issue was put in purely hypothetical terms. As appears from the transcript (Appendix A), carriers' counsel embarked on a testing of Mr. Luna's contingent plans, as of course he had a right to do in testing the good faith of Mr. Luna's declaration of intention to seek a national agreement.

It is clear from the transcript that Mr. Luna's testimony that his objective was to seek a national agreement and that he would refuse to sign an individual agreement with the struck carriers was in the context of the situation presently existing, where the two carriers involved were in the group represented by the unit engaged in bargaining on a national basis. When he was asked what he would do if the road offered to withdraw from the national group, Mr. Luna inquired whether the road would do that. When the question was renewed on a hypothetical basis, objection was made by Union counsel to the asking of a hypothetical question. We interject that the hypothetical nature of the inquiry was not only plain from the very nature of the question but was underscored by the previous testimony of Mr. Hiltz, the carriers' bargaining spokesman, that while it is entirely voluntary whether a railroad participates in national handling of a dispute, he had not had any occasion, and knew of no instance, in which a railroad that had given a power of attorney to participate in such national handling had subsequently withdrawn the power of attorney. (Tr. 42). Following the objection of Union counsel, the court asked Mr. Luna whether he would accept a private settlement agreement, but the court did not set forth as a premise either that the road would have withdrawn from the national group, or on what terms.

Our concern with the abstract and hypothetical predicate underlying the District Court's statement of an absolute principle is heightened by our judgment that the concrete facts as they developed would have a bearing on the legal principle involved, and in all likelihood on the actual response of the Union in the light of the facts as they took shape. The Union's willingness and obligation to negotiate with, say, Seaboard, might well be affected by the nature and extent of Seaboard's activities and its claim to be an innocent hostage. Suppose Seaboard had proposed further steps toward agreement which the Conference had rejected? Suppose on the contrary it had used its vote and influence to stand firm against national concessions? Suppose

Seaboard claimed that the group had abdicated its implied responsibility to take fair and effective national action in the light of a threat to national bargaining —*e. g.*, had rejected Seaboard's request for more mutualizing of the burden; or for a national response in the form of a unilateral change in work rules.

We feel constrained to interject a note of caution against the confusion that may arise from using for the area of labor relations a conception like that of "hostage" which regenerates the horror with which the free world reacted to the German execution of innocent civilians in the 1940's. And even the rules of international law apparently draw some distinctions in terms of the innocence of the hostage that makes inapplicable a recourse to principles of collective responsibility.[24]

Returning to the subject at hand, we are not to be taken as setting forth one way or the other the principles governing the legitimacy of a Union's refusal to bargain with a struck employer who has withdrawn from a multi-employer group. What we do rule is that this problem may not be taken as permitting the enjoining at its inception of a strike against an employer called for a lawful purpose of exerting economic pressure toward the objective of achieving a national agreement, because of the hypothetical possibility that the facts as they develop may come to show a method in violation of the Act in the Union's refusal to bargain with the struck employer notwithstanding his intervening withdrawal from the group. At such time the court may step in, consider the actual facts, and if appropriate enjoin the continuation of the method or the strike. The carriers could seek such relief, if warranted on the actual facts as they developed, by a motion in their pending complaint and docket. The District Court should not have granted a preliminary injunction on this basis.

6. We conclude this discussion of the merits by noting Judge Pratt's concluding reference (Appendix B) that notwithstanding Judge Parker's opinion, the general rule in the Federal courts has been that selective railway strikes are properly enjoined, as in the instances of the orders entered by Judge Corcoran in the *Alton* case and Judge Robinson in the *Chicago, Burlington & Quincy* case (note 26 *infra*).

Confusion as to the scope of these opinions may be due in part to the different conceptions ascribed to the term "whipsaw" strikes.[25] In any event, as we have already pointed out, it is not a sound reading of *Alton* and earlier opinions to say that they condemn all selective strikes and to gloss over the all-important question of whether the selective strike is one that seeks to disrupt na-

---

24. *See* Whiteman, Digest of International Law, Vol. 10, pp. 321 ff., for rulings of American tribunals after World War II reflecting some differences of understanding, the making of distinctions between hostages and reprisals, and the possibility, under a theory of collective responsibility, of taking hostages if limited to members of the group responsible, and as warning against consequence of future unlawful acts. A Dutch court acknowledged the possibility of hostages by an occupying power when the population was engaged through their government in illegal activity.

The humane treatment provisions of the 1949 Geneva Convention prohibiting the taking of hostages are applicable to persons "taking no active part in the hostilities," including "members of armed forces who have laid down their arms and those placed *hors de combat*."

25. In NLRB v. Truck Drivers Union, 353 U.S. at 90, fn. 7, 77 S.Ct. at 644, Justice Brennan said: " 'Whipsawing' is the process of striking one at a time the employer members of a multi-employer association." But the context was a strike and threat of future strikes "with the 'calculated purpose' of causing 'successive and individual employer capitulations.' " p. 91, 77 S.Ct. p. 645. The term is applied by the carriers to all selective strikes.

It is apparently used by at least some union officials to apply only to pressure put on a particular employer to give a better agreement than one already negotiated with others (Mr. Leighty, Tr. 93).

tional bargaining by achieving individual agreements.[26]

The reasonable probability of success foreseen for the carriers by the District Court rests on an erroneous premise. Under the doctrines we have set forth there is no reasonable probability that the Union's strike will be held violative of the Act in its inception, there being no evidence or finding of bad faith to contradict the statement of the Union's president that the strike was called against two roads in order to generate economic pressure in an effort to revive stalled bargaining and arrive at a national agreement.

## III. CONSIDERATIONS PERTAINING TO REQUEST FOR PRELIMINARY INJUNCTION

We turn to the question whether our function on review at this juncture requires us to affirm the grant of a preliminary injunction notwithstanding our views concerning the error in the approach taken by the District Court.

■ 1. Applicable doctrine states that "a preliminary injunction normally lies in the discretion of the trial judge" and the appellate court's scope of review is limited "to the issues of whether the trial judge abused his discretion in granting the injunction, or rested his analysis upon an erroneous premise." A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969). We think this case falls within the group of situations where the granting of an injunction must be reversed because the trial judge rested his action upon an erroneous premise.[27]

■ The court is obligated to appraise the merits of a case on a request for preliminary injunction. In the first place, the "movant must show a substantial likelihood of success on the merits," [28] a requirement sometimes phrased as a "reasonable probability of success." Moreover, an assessment of the merits also suffuses the other factors requisite to a preliminary injunction—the requirement that movant show irreparable harm in the absence of an injunction, and the need of the court to consider damage to the respondent from granting the injunction, and to consider the public interest involved in both the grant and denial of relief. The accommodation and "balancing" of these considerations often, perhaps typically, depend on underlying premises as to the substantive law defining legal rights.

■ Thus in cases involving a claim by movant of interference with protected freedoms or other constitutional rights, the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an

26. We revert to our earlier discussion. While *Alton* contains some general expressions as to selective strikes, its core doctrine, properly analyzed, is one that permits an injunction when the Union undercuts its duty under the Act to continue national bargaining by its striking individual carriers in an attempt to force individual agreements. Judge Robinson's earlier opinion in Chicago, Burlington & Quincy R. v. Railway Emp. Dept., 301 F.Supp. 603 (D.D.C.1969), dealt with a union that had avowedly refused to engage in national bargaining, and the injunction against the selective strike was only to require the union to discharge that obligation.

*Alton* is entirely congruent with Judge Parker's judgment in *Burlington* (*supra,* p. 610) that a selective strike is "a legitimate economic tool which the union can exert against carriers involved in national handling negotiations so long as the union continues to seek a national agreement by applying economic pressure on the carriers without seeking to coerce individual carriers into disrupting the multi-employer bargaining unit and settling on an individual basis." The *Burlington* opinion (Appendix C) is to the same effect.

27. Compare District 50, United Mine Workers of America v. Internat'l Union, 134 U.S.App.D.C. 34, 412 F.2d 165 (1969); Perry v. Perry, 88 U.S.App. D.C. 337, 338, 190 F.2d 601, 602 (1951); Page Communications v. Resor, #24,784 (D.C.Cir. Dec. 4, 1970, unreported); Ring v. Spina, 148 F.2d 647, 650 (2d Cir. 1945).

28. A Quaker Action Group v. Hickel, *supra,* 137 U.S.App.D.C. at 181, 421 F.2d at 1116, and cases cited.

appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment.[29] It often happens that when the parties present conflicting claims of rights and conflicting fears of threatened injury, one from the impact of the activity sought to be restrained, the other from the impact of any injunctive order, the situation realistically facing the court is this, that one party or the other will be injured whichever course is taken. A sound disposition in the interest of justice from the process of discerning and weighing of pertinent interests must depend on a reflective and attentive appraisal as to the outcome on the merits.[30]

In this case, the District Court voiced a quite proper concern with the possibility that the two struck railroads would suffer substantial and possibly crippling economic harm while the dispute was being resolved on the merits. On the other side of the coin, however, the suspension of the employees' right to strike involves a fundamental right, rooted in the freedom of the citizens of a free society to assemble and organize together for lawful purposes. It was a conviction that the Federal courts had not sufficiently taken into account this freedom of employees that led to the passage of the Norris-LaGuardia Act. The court has authority to issue injunctions to prevent violations of the Railway Labor Act. But that Act too has a central conception that underscores the right of labor to strike, and of management to self help, after the period when these rights have been kept in suspense.

Indeed the Administration's December 1970 request for legislation to avert the rail strike took into account that in view of the protracted nature of the dispute the unions "understandably" felt aggrieved by a proposal for further delay,[31] but expressed the position that the time previously available for intensive consideration of the recommendations of the Emergency Board had been insufficient to grapple with all the intermeshed issues. Three months later the employees' right to strike cannot fairly be suspended in the face of a conclusion on the merits that its assertion violates no legal duty.

The duty to appraise the merits at the stage of preliminary injunction is a duty of appellate as well as trial courts. Usually this appraisal is phrased in terms of probability or substantial likelihood of success after trial. Sometimes, however, the interest of justice is furthered by providing a determination on the merits, both at the trial court and on appeal, if and to the extent that the matter is ripe, notwithstanding that technically the only matter submitted is a request for a preliminary injunction. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584–585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

Insofar as the action of the trial judge on a request for preliminary injunction rests on a premise as to the pertinent rule of law, that premise is reviewable fully and de novo in the appellate court. The matter stands in a different posture from that involved when there is no question or disagreement as to the legal principle involved, and the element of probability of success on the merits depends on a forecast as to the shape of the facts likely to emerge at trial. If the appellate court has a view as to the applicable legal principle that is different from that premised by the trial judge, it has a duty to apply the principle which it believes proper and sound. The reversal of the trial judge in no way reflects a determination that he was unreasonable or arbitrary, or

---

29. *E. g.,* Green v. Kennedy, 309 F.Supp. 1127, 1138–1139 (three-judge court) (D.D.C.1970).

30. Massachusetts Ave. Heights Citizens Assn. v. Embassy Corp., 139 U.S.App. D.C. 355, 356, 433 F.2d 513, 514 (1970).

31. Secretary Hodgson's testimony, Dec. 9, 1970, Senate Hearings, supra note 5, at 10.

chargeable with an abuse of discretion, but only and simply that his premise as to the applicable rule of law is deemed erroneous by the appellate court.

2. Implicit in what we have said is the disposition appropriate for two factors that are often singled out for dominant weight in disposition of preliminary injunction requests. The first is preservation of the status quo. This typically, indeed often, is a central reason for sustaining the grant of a preliminary injunction. But it cannot prevail over a determination that the party enjoined will be deprived of substantial legal rights discerned by appraisal of the merits of the case. There may be an exception for those cases where bond can in any event secure the party enjoined, but that is hardly the situation before us where only a $1,000 bond was provided, and furthermore money damages compensable by bond would be difficult if not impossible to ascertain.

There is an important difference in this regard between the kind of "freeze" order available from a court and from Congress. While Congress may in effect move like a court to enjoin a strike for a temporary period, it has the additional flexibility of being able to write commands that limit the injury to the party enjoined even during the temporary period. The Joint Resolution of December 10, 1970, P.L. 91–541, is a concrete example. In that law Congress found substance in the complaint of the unions of the consequence of further delay in the exercise of their rights, and provided for the granting of wage increases, retroactive in part to January 1, 1970, and in part to November 1, 1970, in accordance with one of the recommendations of Emergency Board 178.

The other doctrine is that the granting or denial of injunctive relief may properly depend on ascertainment of the public interest.[32] A question arises whether a temporary prohibition of selective strikes is in the public interest, whether it may not be in the immediate public interest for strikes to be on a selective basis, against a few roads, rather than on a national basis.[33] If the premise is

32. Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937) : "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

33. We note that the President, in submitting on February 3, 1971, the report called for by P.L. 91–541, proposed legislation that would give the President a choice in case of intractable labor disputes. One alternative would result in a binding determination of the dispute by a new Commission. The other alternative would give the President the option of permitting the parties to maintain selective strikes or lockouts, provided executive determinations ensured the existence of alternative transportation services and the lack of jeopardy to the health and safety of all sections of the Nation.

The legislative history of P.L. 91–541 includes a House debate, 116 Cong.Rec., December 9, 1970, H 11370–11373, on a proposal by Congressman Eckhardt to permit selective strikes involving no more than three carriers in a region, subject to a duty to carry goods affecting health and safety as required by the Secretary of Transportation.

The sponsor urged that the proposal of a limited selective strike was necessary in order to ensure realistic bargaining on the part of the railroads. Both supporters and opponents of the measure assumed that under the existing law the courts would enjoin selective strikes,—an assumption apparently referable to the actions and language of the rulings of the District Court, reviewed above. See, e. g., Mr. Eckhardt: "I think it does little more than restate what is the proper interpretation of that act, but up to now the trial courts have forced upon us a nationwide strike." Mr. Springer: "What the gentleman from Texas is trying to do is to overcome a court decision which forbids exactly what the gentleman is trying to put into this resolution."

Other Congressmen said that the Eckhardt proposal had "some very good points," but that the subject required thorough discussion and more time for consideration than was available in the emergency consideration attending the Joint Resolution. The Eckhardt proposal was defeated. Two months later President Nixon submitted his proposal dis-

that a prohibition of selective strikes is in the public interest, because the union would not dare to exercise its legal right to call a national strike in view of the probability that Congress would intervene to grasp the situation, we first observe that such a premise implies as a consequence that the union has lost the right to any strike whatever,—a position which cannot be taken as defining the public interest unless and until the legislature says so and revises the Act accordingly. Moreover, we question whether a court should directly engage in such calculations of legislative strategy, however realistic. That brings us back to the approach that is plainly appropriate to the judicial branch, to let the judicial action depend on an appraisal of the legal rights of the parties on the merits, at least if the case is ripe, for surely that is in the public interest.

3. While we reverse the order granting the preliminary injunction that has been appealed to this court, we contemplate that the District Court's continuing jurisdiction over the complaint and docket will keep the door of the equity court open and available, on an expeditious basis, for such access as developments may show to be warranted in law. As already noted, while we differ with Judge Pratt as to the legal approach properly applicable we have not termed his action an arbitrary abuse of judicial discretion. And in this opinion (Part II, 5) we have identified his area of concern as one that may properly require judicial consideration depending on the response of the carriers, and perhaps of Congress, to the pressure generated by the calling of a selective strike.

It occurs to this court as a possibility that may merit exploration by the parties, and if necessary by the District Court, that the Union's search for some economic pressure on the railroads to stimulate national bargaining, and the interest in avoiding vengeful harm to carriers without meaningful responsibility or capacity to affect the result, may be reconciled by providing what will in effect be a rotation of selective strikes. These and other possibilities must await concrete proposals and developments, and we intend no ruling on them.

We conclude by referring to a matter that has not been previously identified. This court has noted that carriers and labor alike have an obligation under the Act to treat with each other through "responsible conduct of the process of collective bargaining."[34] That responsibility continues even after the termination of an agreement, and even after the right of strike or self help comes into existence. That responsibility is not consistent with such actions as a deliberate timing of a strike without prior warning, with the purpose of enhancing plant damage, or some other garrotte of jungle warfare.[35]

The difficulties presented by the case before us may have been accentuated by the Union's determination to call a strike effective midnight Sunday, without direct notice to the railroads. We think the continuing duty of responsible bargaining under the Act fairly embraces reasonable notice of a strike or lockout or other self help. In a land conversant with the tradition of two weeks notice for a discharge, that would seem a bench mark for reasonable notice. While a requirement of reasonable notice may be unwelcome to the Union as providing time for counter-measures, it is a limited interference with the protected freedoms that our judgment safeguards, and one

---

cussed above. His report rejected the feasibility of "partial" strikes (the carrying of some goods by a struck railroad) but recommended an option for selective strikes. He recommended the discontinuance of the unemployment benefits generally payable employees striking a railroad.

34. Brotherhood of Railroad Trainmen v. Akron & B. B. R., 128 U.S.App.D.C. 59, 74, 385 F.2d 581, 596 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed. 2d 983 (1968).

35. NLRB v. Marshall Car Wheel & F. Co., 218 F.2d 409, 413 (5th Cir. 1955).

that is appropriate in view of the purpose of the Act to achieve resolution of disputes as far as possible through responsible bargaining.

Our view that the Union's selective strike is lawful in its inception depends on an assumption of good faith as to its stated purpose of the strike. The District Court has continuing jurisdiction to reappraise the Union's good faith in the light of either substantial evidence not previously available or developments as to tactics and methods following notice to the carriers of the strike call.

The order of the District Court granting a preliminary injunction is reversed. The cause is remanded to remain on the docket of the District Court and subject to its continuing jurisdiction, for such further proceedings as may become appropriate, not inconsistent with the opinion of this Court.

So ordered.

## APPENDIX A

United States District Court
For the District of Columbia

———

Civil Action No. 2717–70

———

Delaware & Hudson Ry. Co., et al.
v.
United Transportation Union

———

Excerpts from testimony of
Charles Luna, March 10, 1971
(Tr. 50–83)

### I. *Direct Testimony*

Q  You say the notices that you served initially were entirely related to wages?

A  First notices, yes, sir. And that is all we intended to serve, unless the carriers served a counter-proposal on some rules.

Q  Did you serve those notices uniformly on all the carriers with which you do business?

A  Yes, sir, on wages, we did. Yes, sir.

Q  Did you ask the various carriers to join in authorizing their respected [sic] carrier's conference committees in the National Railway Labor Conference to handle this nationally?

A  I am sure we did on wages. We always try to handle wages on a national basis, because as long as I can recall the wages it has been the same.

Q  Has it been consistently your objective, since this movement started, to handle the wage issue on a national basis?

A  You have to do that. We would have chaos in the industry and in our organization, too, if two men were doing the same work and getting different pay. It has to be handled that way.

Q  Was this your objective?

A  It is my objective now.

Q  It is your objective now.

Let me ask you the specific question, then, Mr. Luna:

You did authorize the general committees on the Seaboard and on the Burlington Northern to withdraw from service as of 12:01 a. m. on the 8th of March.

Was it your objective to get a national settlement—

A  Definitely.

Q  —out of that?

A  Yes, sir.

Q  You say that was your objective?

A  Yes, sir.

Q  How did you expect that that was going to work?

Did you think that these two railroads would collapse and make individual agreements with you or what did you expect them to do?

A  If I had thought that I was wrong and I never had any thought along that line, because I have been informed that the National Committee has their power of attorney to negotiate for them in this wage and rule case that we are now negotiating and have been negotiating nationally.

My hopes was to put pressure on Mr. Hiltz and the one man at each—the Southeast, the West, and the Eastern railroad has in Mr. Hiltz's committee to put enough pressure on them where we could sit down and get that little distance that we lack between making a national agreement and getting it behind us and getting our people some pay that they rightly deserve.

Q What did you anticipate, if Mr. DeButts or Mr. Rice would have come around to you and said, "We want to make an agreement with you to get you off our back."

What would have been your attitude toward them?

A. I would have told them to get back to their representative in the National Conference and tell them, "Let's make one for the entire railroad industry that I was representing."

Q Have you had any experience, Mr. Luna, for example, with respect to the crew consist dispute in dealing with railroads piecemeal?

A Yes, sir; I sure have.

Q This has been quite a long experience, hasn't it?

A Well, when you talk about doing it piecemeal—five years ago December 31 of 1970, we made a first crew consist agreement. Today we haven't got them all made.

We still have some more that we have got to go to and try to work out an agreement with. It would be an impossibility to work on wages with as many railroads as we have in the United States and handle them one at a time.

Q Let me see whether I get it straight what happened with respect to crew consist.

You said it was five years ago in December 1970? Is that correct?

In other words, you made your first agreement—

A Made the first one.

Q —in '65, I believe.

A I believe that is right. The Luna-Saunders agreement run out December

31 last year, 1970 how come me to remember it.

And we still haven't got all the agreements made today.

Q Mr. Claytor testified with respect to this crew consist question and he indicated that he had had some experience in dealing with that issue.

Did he participate in any national handling of that question?

A The Southern—the railroad that he was the president wasn't a part of the national handling of the crew consist.

Q So whatever experiences Mr. Claytor has had with respect to strikes on his railroad or negotiation of a separate agreement there have been entirely confined to that railroad and then subsequently set a pattern?

Is that correct?

A It was confined to that railroad and the crew consist—the courts ruled that we didn't have to handle it nationally. It has never been handled nationally. And in four times in President's Emergency Board the carrier took the position that it shouldn't be handled nationally, it should be handled on individual properties.

Q Mr. Luna, let me get back for a moment to this authorization you gave for a withdrawal from service on the 8th of March.

Did you authorize your people completely to shut down all service on those railroads?

A I told them to move anything that was for defense or anything that was war materiel. I told them above all, in every telegram that I sent them, to move anything for defense or war materiel.

Q Did you write the President of the United States to that effect?

A I wrote the President of the United States and gave the cabinet members that were interested a copy of it.

Q I would like to show you, Mr. Luna, a copy of a letter which purports to be over your signature and ask you whether this is a copy of the letter you have been talking about.

MR.SHEA: I wonder if counsel would be so good as to let me have a copy of that letter.

THE COURT: I think he would.

THE WITNESS: I would be glad to, Mr. Shea.

That is it.

MR. SCHOENE: I will get a copy for you, Mr. Shea. This is the only copy I have. I will be glad to furnish you with a copy.

If Your Honor please, I would like to have this letter, which Mr. Luna has identified—

THE COURT: That will be marked as Defendants' No. 1, if you want to offer it.

MR. SCHOENE: Thank you. I would like to offer it in evidence.

THE COURT: It will be received.

THE DEPUTY CLERK: Defendants' Exhibit No. 1 marked for identification and received into evidence.

[Defendants' Exhibit No. 1, letter by Mr. Luna, was marked for identification and received in evidence.]

BY MR: SCHOENE:

Q Mr. Luna, you told us that in this dispute, which you started completely as a wage dispute, the carrier served some counter-proposals with respect to rules. Nevertheless, you have told us, also, that you expect a national agreement to come out of this and would only settle on a national basis.

Will you tell us how you would expect the rules to be disposed of on a national basis or what would be a satisfactory disposition of the rules on a national basis?

A It is two ways you could dispose of them.

In the President's Emergency Board report, which isn't binding on either side, they suggested setting up a big committee to make a study of some of these rules and certain rules that should go to them and in the agreement that will be made nationally you will agree on what dispensation to make of these rules.

It will either be referred back to the party, to the individual properties to be settled, they will be referred to this committee that the Emergency Board recommended, or they will be withdrawn. And it has to be made in the national agreement, so that they will be out of the way.

Q So you would expect any agreement that was the objective of your proposed strike to be a national settlement on wages and a national disposition with respect to the rules by one of these devices that you have described?

A We always have. Yes, sir. That is the way we have used it before.

\*   \*   \*   \*   \*   \*

## II. CROSS-EXAMINATION

BY MR. SHEA:

Q Mr. Luna, do you recall appearing before the Senate Committee on Labor and Public Welfare on SJ Resolution 246?

A Is that on December 10th or December 9th?

Q December 9, 1970.

A December 9th, yes, sir.

MR. BERNSTEIN: What year?

THE WITNESS: This year.

MR. SHEA: 1970.

THE WITNESS: 1970.

BY MR. SHEA:

Q Mr. Luna, at that time the Congress and particularly the committee involved had under consideration, did it not, legislation relating to this controversy that is involved here?

A Yes, sir.

Q And am I not correct that you urged upon the committee that they ought to pass legislation which would permit you to engage in selective strikes?

A I think the record will show that I urged the committee to stay out of it and let us handle it under the Railway Labor Act.

\*   \*   \*   \*   \*   \*

Q Am I correct, Mr. Luna, that you said to the committee that if they would

provide so that you might strike on a selective basis—or as the Supreme Court and I call it a whipsaw basis—that you would never have to come back to them? Is that correct?

A  I don't recall it, but—

THE WITNESS: Can I explain?

THE COURT: Go ahead, Mr. Luna.

THE WITNESS: I don't think these labor disputes belong up on the Hill.

Now as long as the railroads has somebody to bail them out, which they have had for years if they can cause a national crisis, I don't want to have to go up there. I don't think it is their responsibility.

Now what we are trying to do and have been trying to do is the only way we can represent our people is have a national strike.

And they know and I know and if you will go back to '46 we had a two-day national strike in 1946. I was switching boxcars. And Harry Truman said he was going to put us in the Army.

And Alvania Johnson and Al Whitney settled it right here in Washington. They wrote us a fairly good letter then that we would never be able to strike these railroads on a national basis.

Now at that time, I think the record will show, we was handling about 86 per cent of the intercity freight. Now we are only handling about 43 per cent of the intercity freight.

MR. SHEA: If the Court please, I don't mind Mr. Luna explaining his answer, but I would like to get on with this examination.

THE COURT: Mr. Luna is going to be over this in a minute.

Go ahead, Mr. Luna.

THE WITNESS: Now we found out that they wasn't going to let us strike nationally and the railroads found it out.

Now they call these selective strikes. We always could have them. We have had them since time immemorial.

But all at once they found out that we had another avenue, we had—the Congress consented to bail us out, so we will force them into a national strike and we will let Congress and the Senate bail us out.

That is not their job in my opinion. And the only thing that we want is so we can represent our members. If we don't, someone else is.

BY MR. SHEA:

Q  Mr. Luna, did you not say to the committee that if they would provide so that you could strike selectively you had had experience with this in the crew consist case and you would get this resolved in the same way that you resolved it in the crew consist case?

\*      \*      \*      \*      \*      \*

MR. BERNSTEIN: If the Court please, I object to that. I would respectfully submit that proper cross-examination would present to the witness a statement he allegedly made to the Congress and ask him if he said it or he didn't and ask him to explain or what else, but not try to test his memory.

THE COURT: Mr. Shea, do you have something you want to show Mr. Luna?

MR. SHEA: Unless Your Honor rules otherwise, I would like him to answer that question.

THE COURT: Can you answer without seeing the statement?

THE WITNESS: My memory is better than the other people on the witness stand, I will promise you that. I will also promise you that the question he just asked, if I said that, I don't testify before anybody like that. And I don't think that I said—

THE COURT: It doesn't sound like what you said?

THE WITNESS: It don't sound like anything anyone would say before a Senate committee.

BY MR. SHEA:

Q  Mr. Luna, permit me to read you from your testimony before the Senate committee—

THE COURT: You might show it to him, first, so he can see what you are reading from, Mr. Shea.

THE WITNESS: That is a good idea. Where is it, Mr. Shea?

MR. BERNSTEIN: May we have the reference, Mr. Shea, so we can follow along your path?

MR. SHEA: You may.

THE WITNESS: I don't object to your reading it at all if you read it all. Don't take it out of—out apart.

MR. BERNSTEIN: May we have the reference, Mr. Shea?

MR. SHEA: Yes, hearing before the Committee on Labor and Public Welfare of the United States Senate, 91st Congress, on SJ Resolution 246, page 63.

MR. BERNSTEIN: Thank you.

BY MR. SHEA:

Q In response to Senator Javits, didn't you say the following:

I have found out in dealing with railroads and we would not have a national emergency if you will go back to what caused the national emergency, I happen to be the one that handled the crew consist case. I happen to be the one that handled the strike on the ACL, the Southern, and the U.P.

We have settled all those crew consist cases but one. We are in the Supreme Court on it now. The only reason we settled was that we could use our economic strength. We were making progress.

Then they take us to a court and they get the judge to give them a restraining order that you can't strike one railroad, you can't strike two railroads, you can't strike three railroads.

\* \* \* \* \* \*

BY MR. SHEA:

Q Did you testify to that, as well as to other things?

A As well as some other things. And you didn't read the complete statement.

THE COURT: You are well represented, Mr. Luna. Your counsel can bring that out, if he wishes.

THE WITNESS: Thank you, sir.

BY MR. SHEA:

Q I will show you this, Mr. Luna—

MR. SHEA: This is page 61 of the hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, HJ Resolution 1413, page 61.

THE WITNESS: Thank you.

Mr. Shea, which part are you taking about? Where does it start?

It is the same testimony, only it is all of it.

BY MR. SHEA:

Q Let me read this to you, Mr. Luna, part of the question from Mr. Adams which was as follows:

One of you have testified that you would be willing to take on one road in one part in each part of the country so there wouldn't be a national emergency.

I want to know whether or not it is possible to create muscle or create this incentive to bargain which seems to be necessary?

We had that before and we would have that again this time, if there wasn't a court order that says we can't strike three railroads, that we have to strike them all.

I used that approach on the crew consist issue. You might remember the crew consist. As a result of being able to do that, we have settled every crew consist in the United States without coming to Congress, except the Chicago Northwestern and it is in the Supreme Court of the United States for the third time.

Did you so testify?

A And the law so reads that way.

Q Mr. Luna, I take it that you informed the Congress that you intended to do in this controversy, if you were permitted, just what you did in the crew consist case?

A Mr. Shea, it's a difference—that crew consist case was ruled by the Supreme Court that you couldn't handle it on a national basis.

Isn't it?

Q  Mr. Luna, if you will just answer my question and I will rephrase it, if you have any difficulty understanding it.

What you plan to do in this case, if permitted, is the same as you did in the crew consist case, that is, to strike one or two or three railroads, seek their capitulation and then go on to others?

A  You couldn't be further from the truth.  I couldn't live with a settlement like that.  I just testified to that.

We have never, as long as I have been in the union, had different rates on different railroads, as far as rates of pay was concerned.

Q  Mr. Luna, are you suggesting that if you strike the Coast Line that there is no way for the Coast Line to settle with you, unless all the other roads settle?

Is that what you are saying?

A  I am telling you the Coast Line tells me Mr. Hiltz and the Conference Committee has his power of attorney.

I have never met with the Coast Line on this.

THE COURT:  I think Mr. Shea is entitled to an answer to the question.

Read it back, Miss Reporter.

(Whereupon, the Reporter read the following question:

"QUESTION: Mr. Luna, are you suggesting that if you strike the Coast Line that there is no way for the Coast Line to settle with you, unless all the other roads settle?

"Is that what you are saying?")

THE WITNESS:  That is exactly what I am saying.

BY MR. SHEA:

Q  So that if the other roads settle, Coast Line will be out until the others or a majority of the others agree?

Is that what you are saying?

A  Not a majority.  They have a conference committee.

THE COURT:  They have a national agreement.

THE WITNESS:  That is right.  It is that simple.

THE COURT:  And if it happened a week later, fine.  But if it took a year, why conceivably Coast Line will still be struck?

THE WITNESS:  That is exactly it, Your Honor.

BY MR. SHEA:

Q  And there would be no way for the Coast Line to settle with you?

A  It is national agreement.

THE COURT:  They couldn't make an individual agreement?

THE WITNESS:  No sir; they couldn't do that.

THE COURT:  And even though they tried hard to get Mr. Hiltz to—

THE WITNESS:  That is their problem.

\*　\*　\*　\*　\*　\*

Q  Mr. Luna, I want to be sure, now, that I understand you.

If you strike the Coast Line, what you are saying is that Mr. Rice has no way of stopping that strike unless he can get all the other railroads to enter into the agreement that you want?

He can't withdraw from national handling, there is no way of his settling that even if it goes on for a year or two?

Is that what you are saying?

A  You didn't say anything about withdrawing before.

Q  Is that what you are saying?

A  I am saying that he is a member of the National Conference Committee.

Q  I see.

A  And the National Conference Committee has told me they had a right to handle all the railroads' business on this movement we are in.

And I am saying that my intentions are to strike Mr. Rice's railroad, as you say, and the Burlington Northern and try to force them to tell their representatives on that National Committee, "You settle this thing, because I don't want my railroad struck."

But I am not about to start settling wages with individual railroads and es-

tablish a lot of different rates over this United States.

Q If Mr. Rice comes to you and says, "Mr. Luna, I just can't stand this any longer. I am withdrawing my authorization to the National Railway Labor Conference. I've got to settle it," you would say, "I won't settle with you. I am going to continue this strike until everyone agrees."

A You are talking about something that hasn't happened.

Is that right?

Q Yes. I am talking about something that hasn't happened.

A Will Mr. Rice do that?

Q I am not talking about what Mr. Rice will do. That is a perfectly appropriate question.

I am asking you—

A For your information—

Q I am asking you if I understand correctly that if Mr. Rice comes to you and says, "I can't stand this strike any longer. I've got to do whatever I can do. I've got to withdraw from national handling and get this settled with you," you would say, "No, sir, withdraw from national handling or anything else, I am not going to agree with you. I am not going to settle this with you. I don't care how long this strike has to go on. I am not going to settle with you until all the railroads agree."

Is that what you are saying?

A You are talking—

MR. BERNSTEIN: If the Court please, before the witness answers, not only is this question put by counsel completely theoretical without any historical precedent in fact, but it is also completely de hors with what the law is.

There is no law that this can't be done. I therefore submit the question be stricken as not being relevant to the facts legally.

THE COURT: Let me ask the question.

If Mr. Rice wanted to make a private agreement with you involving Seaboard in order to end this strike, you would not accept such a settlement? Is that correct?

THE WITNESS: No, sir; I couldn't.

BY MR. SHEA:

Q Under any circumstances?

A Well, I don't think I would want to go that far. But I think I have answered it.

I might have a gun in my head or something like that.

THE COURT: In other words, Mr. Rice and his road are going to be held hostage until a national agreement takes place?

THE WITNESS: Your Honor, may I explain something?

THE COURT: Let's answer that question.

THE WITNESS: Yes, sir.

THE COURT: All right. Now go ahead Mr. Luna.

THE WITNESS: We are together on wages, Your Honor.

THE COURT: I understand you are.

THE WITNESS: We are together on the wages.

The only thing we are apart on is some rules.

Now my information is that some of the railroads—the information I get back—are not for some of the things that other railroads are for.

THE COURT: That is where the problem is.

THE WITNESS: That is where the problem is. That is exactly right.

As far as the wages are concerned, on the national level, we have come to terms on that.

While we are on that, they keep referring to that testimony there. It was four unions before that Senate committee.

THE COURT: I know it.

THE WITNESS: Three of them is settled and I will take the same settlement they got.

They are wanting us to pay for their raise with our rules. I can't do that.

\*   \*   \*   \*   \*   \*

## III. REDIRECT EXAMINATION

MR. SCHOENE: I just want to give Mr. Luna the opportunity to put into the record the entire answer that Mr. Shea had him read in part.

BY MR. SCHOENE:

Q I think, Mr. Luna, Mr. Shea presented you with the statement which you made in response to a question by Senator Javits before the Committee on Labor and Public Welfare of the United States Senate reported on page 63 of those hearings.

Would you read your entire answer, please, Mr. Luna?

I think you just as well read it, save the Judge time reading it.

A The individual worker, Senator, would get the raise. But the organization is what would take out of its pocket would lose that much.

Let me go a little further. The rules that they are talking about, we might as well face the facts. Some of these rules were in the White House settlement. They have had since 1964 to settle these rules—since 1964.

They do not want to settle the rules. They want somebody to force us to accept them.

I have found out in dealing with the railroads that we would not have a national emergency if we would go back to what caused the national emergency.

I happen to be the one who handled the crew consist cases.

I think the rest if it is in there.

MR. SCHOENE: Mr. Shea, would you mind giving me the page reference?

MR. SHEA: It was on page 61.

MR. SCHOENE: Thank you.

BY MR. SCHOENE:

Q Now would you read the whole of your answer to Mr. Adams from page 61 of the report of the hearings on the Committee on Interstate and Foreign Commerce in the House of Representatives on HJ Resolution 1413 and HJ Resolution 1414, please, Mr. Luna?

A These same rules have gone through negotiations, first. They have gone through mediation, second. And I would say each has at least exchanged proposals on each other at least two or three times already. I think any specific time will bring them to a conclusion because both sides knows how far they can go and how far that they will go. You have to—you have got to have a terminal point so they know if they don't get theirs by the terminal point, that is all.

MR. SCHOENE: Thank you, Mr. Luna.

That is all I have, Your Honor.

Excuse me.

BY MR. SCHOENE:

Q Mr. Luna, I would like to show you page 222 of this same volume of hearings before the Committee on Labor and Public Welfare of the United States Senate.

MR. SHEA: Of the Senate?

MR. SCHOENE: United States Senate, yes.

On SJ Resolution 246.

BY MR. SCHOENE:

Q And I would ask you—

MR. SHEA: What was that page—if I may interrupt?

MR. SCHOENE: 222.

BY MR. SCHOENE:

Q This purports to be a letter from the President of the United States to Senator Javits.

Would you please read that letter in its entirety?

A It is on White House stationery, Washington, December 8, 1970.

"Dear Senator Javits:

"I share your concern about the current railroad labor dispute.

"As you know, I have appointed a Presidential Emergency Board to help resolve the dispute and received that Board's recommendations. Through both George Schultz and directly from Secretary Hodgson, I have been regularly advised of its status.

"Yesterday, I reviewed the status of negotiations and assessed the imminent emergency that would be created by a nation-wide rail industry shutdown. It was my judgment that a message to Congress was called for recommending a time extension during which further bargaining could ensue. For reasons set forth in that statement, I believe that is the right step to take in this dispute at this critical time.

"There is never a 'right time' for a national railroad shutdown, but this is an especially wrong time for such a blow to our economic expansion. That is why I have asked the Congress to act, and why I look forward to your active support.

"Sincerely,

"Richard Nixon."

And copy down there to Hon. Javits, United States Senate.

Q Mr. Luna, did you understand from this letter and from other advices given to you by the Administration that the Administration would not tolerate a national railroad strike?

A They not only told us that, they have proved it to us every time we have tried to have one.

APPENDIX B

UNITED STATES DISTRICT COURT

For the District of Columbia

Civil Action No. 2717-70

Delaware & Hudson Ry. Co., et al.

v.

United Transportation Union

Ruling of United States District Judge

John H. Pratt

March 10, 1971

(Tr. 118–122.)

THE COURT: Gentlemen, this case has been briefed, live testimony has been taken, we have had extensive argument both written and oral, and the matter, it seems to the Court, is ripe for a decision at this time.

As a prelude to what I am going to say and for the benefit of the record, I am going to read the purposes of the Railway Labor Act as set out in Section 151a of 45 U.S.C. This is the preliminary of Section 2 of the Act.

The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

This is an application for a temporary restraining order and a preliminary injunction to prevent selective strikes against the Seaboard and the Burlington.

In connection with its presentation, plaintiff submitted affidavits which indicate that such a strike is imminent and Mr. Luna, on behalf of the union has indicated that such is in contemplation. There isn't any question about the imminence of such a strike.

We have to examine, at the outset, the matter of our jurisdiction to grant the

extraordinary relief which is requested by the plaintiff.

In order to grant relief, the plaintiff must meet the criteria which has been enunciated several times by the Court of Appeals in this Circuit, particularly in Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, at 104 U.S. App.D.C. 106, 259 F.2d 921, and also in the case they decided last summer entitled Quaker Action Group v. Hickel.

Substantially, these criteria are four in number:

First, that the plaintiff must demonstrate a substantial likelihood of success on the merits;

Second, that if relief is not granted, irreparable injury will be suffered by the plaintiff;

Third, would the issuance of the injunction substantially harm others in the proceeding. For example, would the union be irreparably injured?

Fourth, and finally, where lies the public interest?

Accoring to the very frank testimony of Mr. Luna, both the Seaboard and the Burlington would be struck until a national agreement is reached. No private agreements with these two carriers would be entered into.

The purpose of the strike would be to force the Seaboard and the Burlington to put pressure on their bargaining agent in order to reach a national agreement.

This could take a week, a month, or a year. During this particular period of time, however long or however short, these two roads would be struck, their operations would be closed down and there would be no way by entering a private agreement an individual agreement with the union that these two carriers could get back into operation.

We are satisfied that a whipsaw strike for such a purpose violates the Railway Labor Act. Even though self-help is now available, because all formal procedures under the Railway Labor Act have been exhausted, the defendant union is still under a duty to make every reasonable effort to reach an agreement.

This includes the obligation of national handling which, I think it is probably agreed, is appropriate to this particular proceeding and is appropriate also because of the historical experience in the handling of matters of this kind.

Selective strikes of the kind proposed, in our judgment, specifically are a clear violation of the defendant's obligation under Section 2, first and second, of the Act.

Despite Judge Parker's opinion, the general rule in the Federal Courts has been that selective strikes under the circumstances of this case are illegal and properly enjoined.

The decision of Judge Corcoran of this Court in the Alton Case and Judge Robinson of this Court in the Burlington Case are two such opinions.

We, therefore, hold that the plaintiff has demonstrated a substantial likelihood of success on the merits.

Secondly, with respect to irreparable injury, clearly a selective strike would cripple the carrier struck with no adequate remedy at law. They are powerless until a national agreement is reached and their ability to contribute to such a national agreement is something that no one can estimate at this time.

If for good reason, bad reason, or no reason a national agreement is not able to be reached, these two carriers are shut down and remain shut until a national agreement is reached.

Thirdly, with respect to balancing the equities, clearly they favor the two carriers over the union. They face the prospect of permanent injury and they possibly could be put out of business through the mere fact that the group to which they belong has not or has not been able to agree upon terms which are satisfactory to the union.

Fourthly and finally, where does the public interest lie? It seems to me from a reading of the general purposes of the Railway Labor Act, which leads off as a

primary purpose to avoid any interruption to commerce or to the operation of any carrier engaged therein, it seems to the Court that the public interest clearly favors a continuance of operations and a prevention of anything that would interrupt interstate commerce.

For all of the foregoing reasons, we hold that the plaintiff has made a sufficient showing for us to exercise our jurisdiction to grant this relief in the form of a preliminary injunction and if the parties will settle on an order we will sign it.

## APPENDIX C

United States District Court

For the District of Columbia

Civil Action No. 2183–70

United Transportation Union, Plaintiff

v.

Burlington Northern, Inc., et al.,
Defendants

## MEMORANDUM OPINION *

This action, arising under the Railway Labor Act,[1] (hereafter the RLA or the Act), and brought by the United Transportation Union, (hereafter the UTU or the Union) against the major rail carriers of the nation, presents to the Court another chapter of a longstanding dispute dealing with the requirements for manning freight and yard diesel locomotives with firemen. The Union seeks a declaratory judgment that once all bargaining procedures provided under the Act have been exhausted, it has the right to strike the railroads indi-

vidually and selectively and is not restricted to a nationwide strike against all the carriers. The carriers have filed a counterclaim contending that there having been so-called national handling of the fireman manning dispute, any strike by the Union against fewer than all of the carriers involved in such group bargaining violates the Act.

The carriers request the Court to declare the selective strike unlawful and to grant injunctive relief against the Union's proposed course of conduct. At this posture of the proceedings, the Court considers the Union's motion for summary judgment and the motion of the carriers for a preliminary injunction.

For the reasons set forth, the Court concludes that the motion of the plaintiff Union for summary judgment should be granted and the motion of the defendant carriers for a preliminary injunction should be denied.

The underlying problem was recently described in a report of a special panel appointed by President Nixon pursuant to the provisions of the Act.[2]

"The fireman manning issue is the Nation's longest extant labor dispute. And it is also the most studied, reviewed and volatile issue on the American Labor scene. Despite the intensive efforts of a veritable who's who of distinguished labor experts, the parties have failed to agree upon a solution. The dispute has been punctuated by recurrent national crises arising from actual and threatened nation-wide rail stoppages."

The dispute arises out of the continued use of firemen who were employed originally on steam locomotives. The carriers seek complete discretion as to the employment of these firemen on yard and freight

* This memorandum opinion was issued by United States District Judge Barrington Parker on March 8, 1971. The judgment and order in the case were entered on March 18, 1971. The opinion, judgment and order are reported in United Transportation Union v. Burlington Northern, Inc., 325 F.Supp. 1125 (D.D.C. 1971).

1. 44 Stat. 577, as amended, 45 U.S.C. § 151 et seq.

2. Report to the President of Emergency Board No. 177, August 6, 1970, p. 1. The Board was appointed on July 7, 1970, pursuant to 45 U.S.C. § 160.

diesel locomotives and thus to eliminate those whom they, in their own discretion, deem unnecessary. On the other hand, the Union seeks to restore positions previously eliminated, as well as to maintain existing fireman positions. The Union claims that "firemen are essential to rail operations for reasons of (1) safety, (2) avoidance of undue work burdens, (3) efficiency of operations and (4) providing a pool of trained men for promotion to engineer." [3]

The events of this particular chapter of the controversy began in 1963. At that time the Congress, confronted by a nation-wide railroad strike, responded by enacting unprecedented legislation providing for compulsory arbitration of the issue.[4] In accordance with the statute, Arbitration Board 282, composed of representatives of labor, management and the public, was created. The Board rendered an award which was operative for a two year period, expiring on March 31, 1966.

The Board's award, sustained by the Courts against a union challenge,[5] gave authority to the carriers to eliminate certain fireman positions, set forth a procedure for the gradual elimination of the affected employees, and provided for separation benefits.

In November, 1965, prior to the expiration of the award, the Brotherhood of Locomotive Firemen and Enginemen (hereafter the BLF&E), pursuant to the Act,[6] served certain bargaining notices on the carriers, requesting changes in the existing contract requirements governing the manning of freight and yard diesel locomotives with firemen, as modified by the award of Arbitration Board No. 282. In January, 1966, the defendant carriers served counter-notices on the BLF&E seeking the unrestricted right to determine when firemen should be used on diesel freight and yard service locomotives. While several conferences were held between the parties, the carriers contended that the Union's notices were premature, and they refused to engage in negotiations. The BLF&E argued that after expiration of the award the operative work rules were those in effect when the Arbitration Board was created. Our Circuit Court resolved the questions by ruling that the issues presented by the Union's notices were proper and that the carriers were obliged to confer and bargain under the Railway Labor Act even though the period of the award had not expired. Further, the Court held that the carriers could no longer eliminate jobs under the terms of the award once it had expired; that the results of the award remained effective until changed in accordance with the procedures of the RLA; and that the BLF&E could not strike until those procedures were exhausted. Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railroad Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), as amended 1968, cert. denied 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

In mid-1968 the parties invoked the services of the National Mediation Board as provided under the Act.[7] Several rounds of negotiation proved unsuccessful and on November 4, 1969, after advising the parties of failure in its mediation efforts, the Board terminated its services. In accordance with the Act, the parties were then free to resort to self-help on December 5, 1969. However, negotiations were resumed in early 1970 with the assistance of a special mediator appointed by the Secretary of Labor. These negotiations were equally unsuccessful and the efforts of the special mediator were terminated.

3. *Id.*, at 5.

4. Pub.L. No. 88–108, 77 Stat. 132, Aug. 28, 1963.

5. Brotherhood of Locomotive Firemen and Enginemen v. Chicago, Burlington and Quincy Railroad Co., 225 F.Supp. 11 (D.D.C.1964), affirmed 118 U.S.App.D.C. 100, 331 F.2d 1020, cert. denied 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).

6. 45 U.S.C. § 156.

7. 45 U.S.C. § 155 First.

On July 7, 1970, the UTU [8] invoked its right of self-help under the Act on its 1965 bargaining notices and struck four carriers. On that same day the carriers applied for and were granted a temporary restraining order by this Court.[9] The carriers challenged the legality of any selective strike by the Union. Shortly after the issuance of the temporary restraining order, and pursuant to the provisions of the Railway Labor Act, President Nixon created an emergency board to investigate and report concerning the dispute.[10] This action precluded both parties from recourse to self-help for sixty days. Following the presidential action the temporary restraining order was vacated as moot and the carriers withdrew their complaint.

On July 22, 1970, prior to the expiration of the services of Emergency Board 177, the Union filed this action for a declaration that, upon exhaustion of all procedures under the Railway Labor Act, its right to self-help is not restricted to a nationwide strike against all the carriers, but rather it is entitled to strike one or more of the carriers.

Although the Emergency Board made recommendations in its Report to the President on August 6, 1970, the parties were unable to conclude a complete and final agreement. However, negotiations continued by agreement between the Union and the carriers, as well as with the encouragement of this Court. When the matter came before the Court on the Union's motion for summary judgment and the carriers' motion for a preliminary injunction, representations were again made that negotiations would continue. The Union however emphasized that all negotiations subsequent to the report of the Emergency Board were without prejudice to its claimed right of self-help against individual carriers.

At the outset the carriers contend that the action by the Union seeking relief is premature because bargaining and negotiations continue and the possibility of reaching an agreement has not been completely lost and thus no true impasse is present.

The procedures for resolving a major dispute under the Act were recently and succinctly outlined by the Supreme Court:

"* * * A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*. §§ 2 Seventh, 5 First, 6, 10." Brotherhood of Railroad Trainmen et al. v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

This current phase of negotiations on the fireman manning issue extends over a five year period. There have been endless and protracted bargaining conferences. The services of the National Mediation Board have been utilized. Arbitra-

---

8. The Brotherhood of Locomotive Firemen and Enginemen and three other unions, merged on January 1, 1969, to form the United Transportation Union.

9. Burlington Northern, Inc., et al. v. United Transportation Union, Civil Action No. 2026–70, (filed July 7, 1970).

10. See footnote 2, *supra.*

tion has been rejected by the Union. Presidential action further delaying a strike has been taken. Services of special mediators have been employed. All of these efforts undertaken within the framework of the Railway Labor Act have nevertheless proved unavailing to secure a mutually satisfactory agreement.

The Court, therefore, finds from this record that all statutory procedures have been exhausted. A strike is now imminent and the Union has declared its intention to move on a selective basis. It seeks a ruling from this Court at the point when all statutory requirements have been expended. The carriers' motion for a preliminary injunction as well as their counsel's suggestion at oral argument that the Court could grant relief on their behalf by way of summary judgment appear to be veiled recognition of the futility of the bargaining process at this point.

But has the Union in its various stages of negotiations bargained in good faith and thus exhausted the statutory remedies in fact as well as within the framework of the statutory requirements?

In Virginia Railway Co. v. System Federation, etc., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) Justice Stone commented on this duty under the Railway Labor Act as follows:

"* * * The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representatives of its employees, * * *, to enter into a negotiation for the settlement of labor disputes such as is contemplated by section 2, First." at 548, 57 S.Ct. at 599. Also, NLRB v. Insurance Agents' International Union, AFL–CIO, 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

In Atlantic Coast Line Railroad Co. et al. v. Brotherhood of Railroad Train-

men, 262 F.Supp. 177, 183 (D.D.C.1967), affirmed in part and reversed in part, *sub nom.* Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Company et al., 127 U.S.App.D.C. 298, 383 F.2d 225 (1967), cert. denied, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968). Judge Holtzoff stated that good faith bargaining suggests

"* * * an obligation to negotiate genuinely and sincerely with the aim of amicably settling the differences between the parties and concluding an agreement. It is not sufficient to appear at a conference or a meeting with the other party and to submit an offer, or to make a demand, and yet to decline to argue its merits, or to refuse to entertain or discuss a counterproposal. It is not a genuine negotiation to indicate that the other party has no choice except to accept the offer or accede to the demand. The service of an ultimatum does not constitute a negotiation."

But, as our Court of Appeals has noted,

"The procedures of the Act are purposefully long and drawn out to afford the maximum inducement to peaceful settlement, but the Act does not require efforts clearly at war with reality." Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Company et al., 127 U.S.App.D.C. 298, 302, 383 F.2d 225, 229 (1967), cert. denied 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968).

Upon a review of the entire record in this proceeding within the framework of the relevant case law, the Court finds no facts presented upon which it could conclude or infer that the Union has not bargained in good faith. In fact, it is the carriers who arguably have a vested interest in further delay since the results of Arbitration Award 282 remain in effect until changed by contract or in accordance with statutory procedures. Brotherhood of Railroad Trainmen v. Ak-

ron & Barberton Belt Railroad Co., *supra*.[11]

The carriers' thesis that previous national handling of labor disputes precludes the Union's resort to selective strikes finds no support in either the history of labor-management disputes in the railroad industry, the RLA, or appellate case law.[12] During the past twenty years the predecessor union, the BLF&E, and other railroad operating unions have on numerous occasions exercised the right to individual and selective strikes even though the basic dispute giving rise to the strike had been and was at the time the subject of national handling.

In early 1950, the identical issue underlying this proceeding, the extent to which diesel locomotives should be manned with firemen, gave rise to a selective strike by the BLF&E. At that time, the procedures of the Act had been exhausted through national handling by the parties without success. That union, then representing the firemen, resorted to a strike against only eight of the nation's carriers participating in negotiations.[13] This strike led to the enactment of the National Diesel Agreement of May 17, 1950.

Likewise in 1952, the BLF&E, in concert with the Brotherhood of Locomotive Engineers and the Order of Railway Conductors resorted to a selective strike against several carriers.[14] The matters involved—wages and rules—were and had been subject to national handling. However, the unions saw fit to strike a few of the carriers involved.

A similar strategy has been employed by railroad unions other than the BLF&E. In 1950 the Switchmen's Union of North America, later becoming a member of the UTU, struck five railroads on the matter of the 40-hour work week.[15] There too, immediately prior to the strike, the matter had been the subject of national handling.

And, in 1955 unions representing certain non-operating railroad employees called a strike against a group of Southeastern carriers (the Louisville and Nashville Railroad System) on matters then in national handling.[16] Involved in the national handling of negotiations were three carrier associations—the Eastern and Western Carriers' Conference Committees and the Southeastern Carriers' Conference Committee. The carriers affiliated with the Eastern and Western Committees executed a collective bargaining agreement with the unions. But the Southeastern Carriers refused to ratify the agreement executed by other carriers. The unions then struck against the Louisville and Nashville System, part of the Southeastern Conference. That strike is also of importance since it demonstrates that on at least one occasion the carriers themselves have taken selective action on matters in national handling.

Finally, the Court notes that only several years ago the carriers, by implication, recognized selective strikes as a legitimate and legal union weapon upon exhaustion of statutory procedural requirements. Kennedy et al. v. Long Island Rail Road Company, et al., 211 F. Supp. 478 (S.D.N.Y.1962), aff'd 319 F. 2d 366 (2nd Cir. 1963), cert. denied 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963). There, as a direct response to

---

11. At the expiration of the Award, on March 31, 1966, 18,000 firemen's jobs, approximately 60 percent of those subject to the jurisdiction of the Award, had been eliminated.

12. After careful consideration this Court is unable to agree with the relevant conclusions reached in Alton & Southern Railway Company et al. v. International Association of Machinists and Aerospace Workers et al., 310 F.Supp. 905 (D.D.C. 1970), appeal pending No. 24217 (U.S. App.D.C.).

13. Sixteenth Annual Report of the National Mediation Board, p. 5 (1950).

14. Eighteenth Annual Report of the National Mediation Board, pps. 6–8 (1952).

15. Sixteenth Annual Report of the National Mediation Board, pps. 11–13 (1950).

16. Twenty-First Annual Report of the National Mediation Board, pps. 5–7 (1955).

the union's strike against a single railroad, the Long Island, the carriers created an insurance plan designed to protect their group. No contention was made by the carriers that the selective strike against Long Island was illegal, but rather they defended the insurance plan as a necessary responsive weapon to the union's action.

The Union's position also finds irrefutable support in recent Supreme Court decisions. In Brotherhood of Railroad Trainmen et al. v. Jacksonville Terminal Co., *supra*, the Court emphasized

"Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.' * * * We have consistently so held in a long line of decisions. * * *" 394 U.S. at 378, 89 S.Ct. at 1115 (citations omitted).

As recent history demonstrates, support of the position of the carriers would inevitably result in a choice between never striking or precipitating a national emergency and an imposed settlement,[17] thus depriving the employees of their implicitly guaranteed and most effective economic tactic—the right to strike.

The RLA makes no provision for compulsory arbitration of major disputes.[18]

And the Supreme Court has admonished against

"* * * functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands * * * [by entering into] the substantive aspects of the bargaining process to an extent Congress has not countenanced." NLRB v. Insurance Agents' International Union, AFL–CIO, *supra*, 361 U.S. at 497, 498, 80 S.Ct. at 431, 432. See also NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, Int'l Bro. of Teamsters, etc. of America, 362 U.S. 274, 281–284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960); NLRB v. Erie Resistor Corp. et al., 373 U.S. 221, 234, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

There is no authority for this Court to concern itself with what "economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining." NLRB v. Insurance Agents' Int'l Union, *supra*, 361 U.S. at 500, 80 S.Ct. at 433. "* * * [T]here is simply no inconsistency between the application of economic pressure and good faith collective bargaining." *Id.*, at 494, 495, 80 S.Ct. at 430.

The Court concludes that national handling of the fireman manning dispute is obligatory in negotiations because of the "practical appropriateness of mass bargaining" and the "historical experience" in these circumstances.[19] Considerations of safety and training for future locomotive engineers are uniquely appropriate

17. See: Act of August 28, 1963, Pub.L. No. 88–108, 77 Stat. 132. Also, Act of July 17, 1967, Pub.L. No. 90–54, 81 Stat. 122; Act of April 9, 1970, Pub.L. No. 91–226, 84 Stat. 118.

18. See 45 U.S.C. §§ 157, 158 and 159.

19. Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad Co., *supra*. There the issue was whether a union is

required to continue *negotiating* on a national handling basis once such a course had been undertaken. The issue of striking once negotiations had reached a statutory impasse was not considered. See also, Chicago, Burlington & Quincy Railroad v. Railway Employes' Department, AFL–CIO, 301 F.Supp. 603 (D.D.C. 1969).

for general national standards. And negotiations and past agreements concerning the fireman manning dispute indicate a clear acceptance by the parties of national handling.[20] But once the statutory procedures have been exhausted in good faith without agreement negotiations have legally reached an impasse. Selective strike action then becomes a legitimate economic tool so long as the Union continues to seek a national agreement by applying economic pressure on the carriers without seeking to coerce individual carriers into deserting the multi-employer bargaining unit and settling on an individual basis.[21] See American Shipbuilding Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); Morand Bros. Beverage Co. v. NLRB, 190 F.2d 576, 581–582 (7th Cir. 1951).[22]

Despite the immediate public interest and pressure for a resolution of the fireman manning dispute, support of the position of the carriers would encourage nationwide strikes[23] and read a new chapter into the provisions of the Railway Labor Act in disregard of the express mandate of Congress.

Counsel for the plaintiff will submit an appropriate order within five days.

BARRINGTON PARKER
Judge

March 8, 1971

20. See especially: 1950 National Diesel Agreement; the chronology of the dispute, Report of Emergency Board No. 177, Appendix B., *supra*; and Supplementary Affidavit of Jess L. Shattuck, attached to Reply Memorandum for plaintiff, filed in this proceeding December 10, 1970, par. 7, p. 3.

21. The Court does not decide whether selective strikes are so limited when national handling is not obligatory. And since this is a declaratory action, the Court merely prescribes what is permissible in the future. Whether previous actions failed to conform with this Memorandum Opinion need not be examined.

22. The cases cited by the carriers, particularly at page 20 of their supplemental

memorandum of points and authorities in opposition to the plaintiff's motion for summary judgment, filed September 21, 1970, all support the position that a whipsaw strike under the National Labor Relations Act is prohibited only when its purpose is to compel individual employers to withdraw from an existing multi-employer bargaining unit.

23. Criticisms of the RLA have been directed at the delays in reaching agreement rather than the Act's rather successful record in preventing national strikes. D. Cullen, National Emergency Strikes (1968), n. 11 at 69; L. H. Silberman, National Emergency Disputes—The Considerations behind A Legislative Proposal, 4 Georgia L.Rev. 673, 676 (1970).